*In re* ESTATE OF CHARLES B. WINSTEAD, Deceased (Marilyn Winstead, Claimant-Appellant, v. Peoples Bank of Bloomington, Adm'r with Will Annexed of the Estate of Charles B. Winstead, Deceased, Defendant-Appellee).

Fourth District    No. 4—85—0706

Opinion filed June 3, 1986.—Rehearing denied July 1, 1986.

James W. Yoder and J. Stephen Yoder, both of Yoder & Yoder, of Bloomington, for appellant.

William C. Wetzel, of Livingston, Barger, Brandt & Schroeder, of Bloomington, for appellee.

JUSTICE SPITZ delivered the opinion of the court:

The owner of a life insurance policy pledges the policy to a bank as collateral for farm operating loans. The bank is not, however, designated as a beneficiary of the policy. Upon the death of the owner of the policy, the bank elects to satisfy a part of the policy owner's indebtedness by appropriating to itself the entire proceeds of the policy. Under these circumstances, is the beneficiary named in the pol-

icy entitled to subrogation to the claim which the bank would have had against the decedent's estate absent the availability to the bank of the life insurance policy proceeds?

Yes.

We reverse.

Prior to his death on December 7, 1983, Charles B. Winstead was a farmer who had a revolving line of credit at the Atlanta (Illinois) National Bank (ANB). The amounts which he borrowed from ANB were used for his operating, machinery, equipment, and living expenses.

In his will executed November 22, 1983, Winstead devised a life estate in his real estate to his wife, Marilyn, with the remaining interest to be divided equally among his issue and his wife's two godchildren. He also devised to his wife all the furnishings of his residence, any cars and trucks titled in his name at the time of his death, and three horses. All other property, "whether real, personal, life insurance or any other form," was to be divided equally between Marilyn (provided that she survived him for 30 days) and his issue. Winstead's will further provided that "all debts and obligations not paid at my death" were to be paid from the above-mentioned estate residue.

Following the initiation of probate proceedings, Marilyn filed a claim against Winstead's estate. As the basis for her claim, Marilyn stated that she was the beneficiary of a $150,000 policy on Winstead's life issued by the Inter-Ocean Insurance Company, and that by virtue of a collateral assignment of the policy by Winstead, the proceeds thereof were paid to ANB to reduce a debt of Winstead's which would have been a legitimate claim against his estate and against estate assets in which ANB held a perfected security interest. Marilyn requested that the assets of Winstead's estate be marshalled in order to replace the proceeds of the life insurance policy, or alternatively that she be subrogated to the claim which but for the life insurance proceeds, ANB would have had against both Winstead's estate and the estate assets in which the bank held a security interest.

The evidence presented at the hearing on Marilyn's claim consisted entirely of factual stipulations and the deposition of Rodney L. Albers. The parties stipulated that on August 23, 1982, Winstead applied for a $150,000 life insurance policy with the Inter-Ocean Insurance Company. In his application, Winstead designated his estate as the policy beneficiary, and the policy was issued on October 19, 1982. Winstead wedded Marilyn on September 25, 1982, and on November

5, 1982, he requested that Marilyn be designated beneficiary of his life insurance policy, with his three children as contingent beneficiaries. Inter-Ocean complied with that request on November 18, 1982. Also on November 5, 1982, Winstead executed a collateral assignment of his life insurance policy to ANB. Inter-Ocean did not, however, accept that assignment for filing at its Cincinnati, Ohio, office until April 13, 1983.

Prior to his death, Winstead had executed three security agreements with respect to his debts to ANB (which totaled $177,446), and three Uniform Commercial Code financing statements with respect to the ANB debts on file at the time of his death. Inter-Ocean subsequently honored Winstead's assignment of his life insurance policy and ANB received its $150,000 face value on January 23, 1984. Neither before nor after receiving the policy proceeds did ANB assert a claim against Winstead's estate with respect to the collateral described in the security agreements and financing statements. The parties further stipulated that the value of Winstead's estate's assets which were pledged to secure Winstead's obligations to ANB was more than $100,000 but probably less than $200,000.

In a deposition, Rodney L. Albers, an assistant cashier and loan officer at ANB, testified that he had had a working relationship with Winstead since 1981. None of the security agreements which Winstead executed in favor of ANB had been released at the time of his death. According to Albers, ANB first requested that Winstead assign to it a life insurance policy in mid-1982. Albers became aware of the existence of Winstead's life insurance policy upon reviewing a statement of Winstead's financial condition, which listed "[h]undred fifty thousand [life insurance], with the spouse and children as beneficiaries." Although Albers first requested assignment of Winstead's life insurance policy in November 1982, the assignment (dated November 5, 1982) was not received by ANB until shortly before Inter-Ocean accepted it for filing on April 13, 1983. ANB requested assignment of Winstead's life insurance policy because it felt that there was insufficient collateral for Winstead's line of credit, and the bank was looking to Winstead's future earnings for repayment of a portion of his debts.

Winstead provided no instructions as to what assets ANB was to utilize to satisfy his debts in the event of his death, and before collecting the proceeds of Winstead's life insurance policy, ANB made no effort to realize payment of his debts from the other pledged collateral. Essentially, ANB decided to satisfy Winstead's indebtedness by appropriating the proceeds of his life insurance policy because

that was a more convenient method of obtaining payment of his debts. The insurance proceeds did not, however, fully reduce Winstead's indebtedness; a remaining amount of $31,091.09 was realized from other assets of Winstead's estate. At the time of the deposition, ANB's claim against Winstead's estate was entitled to be released.

On cross-examination, Albers stated that ANB did not foreclose on Winstead's collateral (other than the life insurance policy) following his death because it was advised by its attorney that it could not do so and that Winstead's indebtedness instead "had to be settled by the estate."

The "Assignment of Life Insurance Contract as Collateral" form which Winstead executed with respect to the Inter-Ocean life insurance policy contains, *inter alia,* the following provisions:

"B. It is expressly agreed that, without detracting from the generality of the foregoing, the following specific rights are included in this assignment and pass by virtue hereof:

1. The sole right to collect from the Insurer the net proceeds of the Policy when it becomes a claim by death or maturity;

\* \* \*

C. It is expressly agreed that the following specific rights, so long as the Policy has not been surrendered, are reserved and excluded from this assignment and do not pass by virtue hereof:

1. The right to collect from the Insurer any disability benefit payable in cash that does not reduce the amount of insurance;

2. The right to designate and change the beneficiary;

3. The right to elect any optional mode of settlement permitted by the Policy or allowed by the Insurer; but the reservation of these rights shall in no way impair the right of the Assignee to surrender the Policy completely with all its incidents or impair any other right of the Assignee hereunder, and any designation or change of beneficiary or election of a mode of settlement shall be made subject to this assignment and to the rights of the Assignee hereunder.

\* \* \*

E. The Assignee covenants and agrees with the undersigned as follows:

1. That any balance of sums received hereunder from the Insurer remaining after payment of the then existing Liabilities, matured or unmatured, shall be paid by the Assignee to the

persons entitled thereto under the terms of the Policy had this assignment not been executed;

\*\*\*

3. That the Assignee will upon request forward without unreasonable delay to the Insurer the Policy for endorsement of any designation or change of beneficiary or any election of an optional mode of settlement. \* \* \*

H. The exercise of any right, option, privilege or power given herein to the Assignee shall be at the option of the Assignee, but \*\*\* the Assignee may exercise any such right, option, privilege or power without notice to, or assent by, or affecting the liability of, or releasing any interest hereby assigned by the undersigned, or any of them.

I. The Assignee may take or release other security, may release any party primarily or secondarily liable for any of the Liabilities, may grant extensions, renewals or indulgences with respect to the Liabilities, or may apply to the Liabilities in such order as the Assignee shall determine, the proceeds of the Policy hereby assigned or any amount received on account of the Policy by the exercise of any right permitted under this assignment, without resorting or regard to other security."

In its order entered October 11, 1985, the circuit court stated that in cases of this type, the decedent's intent controls. The court further held that the provisions of the assignment form executed by Winstead giving ANB the sole right to collect from the insurer the amount of the insurance proceeds (subparagraph B(1)), providing for the payment by the assignee to the persons entitled thereto of the amount of the insurance proceeds remaining after satisfaction of the decedent's debts to the assignee (subparagraph E(1)), and authorizing the assignee to "take or release other security" and to "release any party primarily or secondarily liable" for the decedent's debts (paragraph I), evidenced an intent on the part of Winstead to constitute ANB primary beneficiary of the policy to the extent necessary to pay his debts to ANB and to constitute Marilyn as a secondary beneficiary. The court further stated:

"[The] decedent's Will, executed after the assignment and after he became ill, indicates he had a thorough understanding of the objects of his bounty and the extent of his property together with a comprehensive plan for its distribution which would be frustrated by subrogation or marshalling and thus contrary to his testamentary intention as expressed in said

Will."

On this basis, the court denied Marilyn's claim.

Marilyn's argument that the circuit court erred in denying her claim for subrogation is essentially premised on the assertion that the printed form language on which the circuit court based its decision cannot possibly be deemed dispositive with respect to the question of Winstead's intent regarding the disposition of the proceeds of his life insurance policy. She maintains that when all of the relevant facts are considered, it is clear that Winstead intended that his debts to ANB be satisfied from assets other than his life insurance policy. A creditor's arbitrary decision to partially satisfy a decedent's indebtedness from the proceeds of a life insurance policy should not, contends Marilyn, be permitted to deprive the beneficiary named in the policy of her right to the policy proceeds.

Alternatively, Marilyn asserts, without citation of authority, that even if she is not entitled to subrogation to the right to proceed against Winstead's estate which ANB would have had but for the life insurance proceeds, the collateral pledged to secure Winstead's debts to ANB (valued at more than $100,000), and the insurance proceeds should be marshalled in order that all of the collateral bears a proportionate share of Winstead's debts.

Winstead's estate argues that in view of all of the evidence, Marilyn did not meet her burden of proving that Winstead intended that ANB first look to assets other than the life insurance policy proceeds for satisfaction of his debts, and that all of the relevant circumstances generally support the circuit court's decision. In support of its position, the estate relies upon the following asserted facts: (1) At the time Winstead assigned his life insurance policy to ANB, he owed ANB exactly $150,000; (2) Winstead applied for his life insurance policy prior to the time that he wedded Marilyn and at that time named his estate as beneficiary; (3) Winstead obtained the $150,000 life insurance policy at ANB's request; (4) Winstead named Marilyn as beneficiary at the same time that he assigned the policy to ANB; and (5) a provision of Winstead's will provides that "all debts and obligations not paid *at my death*" (emphasis added) are to be satisfied from the residue of the estate. Also in support of its position, the estate relies on the provisions of the assignment form which Winstead executed dealing with the collection of the policy proceeds (subparagraph B(1)), disposition of policy proceeds in excess of Winstead's debts (subparagraph E(1)), and ANB's right to collect the policy proceeds without resorting to other security for Winstead's debts (paragraph I). The estate finally contends that the facts

and circumstances of this case do not provide a basis for utilization of the equitable remedy of marshalling.

In her reply brief, Marilyn points out that grain which Winstead planned to sell in order to make partial repayment of his loans to ANB was inventoried as a part of his estate, and that had ANB elected to satisfy Winstead's indebtedness by filing a claim against his estate, the estate certainly would have had no right to proceed against the beneficiary of Winstead's life insurance policy in order to recoup the amount of Winstead's indebtedness so satisfied.

There are no Illinois appellate or supreme court decisions dealing with the precise factual situation involved in the present case. The applicable equitable principles are, however, rather well developed in cases from other jurisdictions. Generally, the decedent's intent is the paramount factor in determining whether the beneficiary of an insurance policy on the decedent's life should be subrogated to the rights which a debtor-assignee who collected the proceeds of the policy would have had against the decedent's estate but for the availability of the insurance proceeds. (*Chaplin v. Merchants National Bank* (N.D. Ill. 1959), 186 F. Supp. 273; *Falk v. Vreeland Trading Corp.* (1985), 284 S.C. 201, 325 S.E.2d 333; *Seitz v. Seitz* (1960), 238 Miss. 296, 118 So. 2d 351.) The decedent's intent is to be gleaned from the relevant writings, *i.e.*, the assignment and designation of beneficiary forms, the note(s) evidencing the decedent's indebtedness, and the decedent's will. Factors particularly relevant to ascertainment of the decedent's intention with regard to this matter are whether he or she made a *pro tanto* designation of the creditor as beneficiary of the life insurance policy, whether the designation of beneficiary form expressly states that the beneficiary is entitled only to the amount of the policy proceeds remaining after retirement of the decedent's indebtedness to the assignee of the policy, and whether the decedent otherwise explicitly stated that the insurance proceeds were to be the primary fund for payment of his debt. Negative answers to these queries are indicative of an intention on the part of the decedent that the assigned policy not be the primary source for satisfaction of the debt for which the policy stands as collateral. *Chaplan v. Merchants National Bank* (N.D. Ill. 1959), 186 F. Supp. 273; *Barbin v. Moore* (1932), 85 N.H. 362, 159 A. 409, 83 A.L.R. 62; *Walzer v. Walzer* (1957), 3 N.Y.2d 8, 163 N.Y.S.2d 632, 143 N.E.2d 361.

Moreover, the great majority of modern decisions hold that where there is no clearly expressed intention on the part of the decedent that the assigned policy be the primary source of funds for

satisfaction of the indebtedness which it was assigned to secure, the creditor-assignee should not be permitted to arbitrarily reduce the amount of the proceeds which the beneficiary receives from the insurance policy by electing to satisfy the decedent's indebtedness through appropriation of the proceeds of the assigned policy rather than by filing a claim against the decedent's estate for the amount of the indebtedness. In the absence of a specific intention on the part of the decedent that the life insurance policy proceeds be utilized to satisfy his indebtedness, approval of such action would permit the use of a portion of the named beneficiary's money to pay a debt for which the decedent's estate is primarily liable. (*Mutual Life Insurance Co. v. Illinois National Bank* (E.D. Mich. 1940), 34 F. Supp. 206; *Russell v. Owen* (1932), 203 N.C. 262, 165 S.E. 687; *Smith v. Coleman* (1945), 184 Va. 259, 35 S.E.2d 107, 160 A.L.R. 1376.) Courts reaching the above conclusion have noted that "collateral," when used with reference to the assignment of an insurance policy, generally means secondary or subsidiary. See *Barbin v. Moore* (1932), 85 N.H. 362, 159 A. 409, 83 A.L.R. 62; *Chamberlin v. First Trust & Deposit Co.* (Sup. Ct. 1939), 172 Misc. 472, 15 N.Y.S.2d 168.

In beginning our analysis of the facts of this case in view of the relevant equitable principles, we note that the estate's assertion that at the time that Winstead assigned his life insurance policy to ANB, he owed ANB exactly $150,000, is not supported by the record. In fact, Albers' deposition testimony reflects that on May 17, 1983, the nearest date to the time that Winstead's assignment became effective for which there appears of record a figure as to the amount of Winstead's liabilities to ANB, Winstead's debts to ANB totalled $137,000. Also contrary to the estate's contention, the record contains no evidence that Winstead first obtained the $150,000 life insurance policy at ANB's request. Rather, Albers testified that ANB first learned of the existence of Winstead's life insurance as a result of information contained in Winstead's financial statements.

■ Upon thoroughly reviewing the record of the proceedings below, we have concluded that there is no evidence of an unequivocal intention on the part of Winstead that the proceeds of his $150,000 life insurance policy be utilized as the primary fund for satisfaction of his indebtedness to ANB. Although the terms of the assignment form which Winstead executed give the assignee the right to collect the policy proceeds, those provisions simply refer to the naked right to collect the proceeds and do not purport to affect the equitable rights of the designated beneficiary to the amount so collected. This

conclusion is reinforced by subparagraph C(2), which reserves to the owner of the policy, "[t]he right to designate and change the beneficiary." The implication of this language is that the right to collect the policy proceeds upon the decedent's death and the beneficial interest in the proceeds are two separate matters.

Also, as Marilyn points out, the security agreements executed in connection with Winstead's debts to ANB listed only assets related to his farming operations as security for the amounts loaned. If Winstead had intended that his life insurance policy stand as the principal security for the loans, he could have designated the policy as the sole collateral therefor, or at least listed the policy along with the other assets which stood as security for his debts.

Finally, Winstead executed both the assignment and the change of beneficiary form which designated Marilyn as beneficiary on November 5, 1982. If he had intended that ANB be the primary beneficiary of the insurance policy, he easily could have designated ANB, instead of Marilyn, as the primary beneficiary at that time.

■ As previously stated, Winstead's estate relies, in support of its argument that Marilyn is not entitled to subrogation, on the portion of Winstead's will which provides that all debts and liabilities "not paid at my death" are to be paid from the estate residue. However, life insurance benefits generally are not paid instantly upon the decedent's death. As was the case with the proceeds of Winstead's policy, there is usually a delay of at least several weeks between the decedent's death and payment of benefits. The beneficiary's equitable right to the policy proceeds, by contrast, vests in the beneficiary at the time of the decedent's death (*Freund v. Freund* (1905), 218 Ill. 189, 75 N.E. 925), if the decedent has not manifested an intention that an assignee of the policy have a superior right to the policy proceeds. Since there is no evidence of such an intention on the part of Winstead, his debts to ANB can in no way be said to have been paid or satisfied at the time of his death. For this reason *Employers Modern Life Co. v. Lindley* (1980), 83 Ill. App. 3d 394, 404 N.E.2d 1036, cited by the estate, is not persuasive. The *Lindley* court held that a named beneficiary acquires no vested right in an insurance policy during the decedent's lifetime. While that is true, Marilyn's equitable right to the proceeds of Winstead's policy did vest immediately upon Winstead's death.

Also cited in support of the estate's argument is *In re Estate of Cohen* (1960), 23 Ill. App. 2d 411, 163 N.E.2d 533. Superficially, *Cohen* is somewhat similar to the present case in that it involved payment of a bank loan from the proceeds of one of the decedent's

life insurance policies of which the bank was not the named beneficiary. The similarities end there, however. Unlike the loans in the case at bar (which were used to finance farming operations), the loan at issue in *Cohen* was utilized to finance the purchase of the life insurance policy which stood as collateral for the loan. The loan proceeds constituted the sole consideration for the life insurance policy, and the loan proceeds were utilized for no purpose other than to pay premiums on the policy. Thus the loan proceeds did not in any way benefit the decedent's estate. In the present case, however, the loan proceeds, having been utilized to finance Winstead's farming operations, considerably augmented his estate. In fact, crops which Winstead planned to sell in order to repay part of his debts to ANB, as well as other security for Winstead's loans with ANB, constituted a major portion of Winstead's estate.

■ In sum, Marilyn made out a *prima facie* case that she has an equitable right to the proceeds of Winstead's life insurance policy by establishing that she was the duly designated beneficiary of the policy. The burden was thereafter upon Winstead's estate to establish that Winstead intended ANB to have an equitable right to the policy proceeds superior to that of Marilyn, such as by establishing that Winstead had designated ANB as a *pro tanto* beneficiary of the policy, or that Winstead's estate was in no way benefited by the insurance proceeds. This the estate did not do. Therefore, Marilyn is entitled to subrogation to the claim which ANB would have had against Winstead's estate but for its receiving payment of a portion of Winstead's indebtedness from the proceeds of his life insurance policy.

Because of our conclusion that Marilyn is entitled to subrogation, we need not consider whether this is a proper case for marshalling the insurance proceeds with the estate assets which secured the decedent's debts.

The circuit court's denial of Marilyn's claim is reversed, and the cause is remanded with directions to enter an order in accordance with the views expressed herein.

Reversed and remanded with directions.

WEBBER and GREEN, JJ., concur.